**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| T-ZONE HEALTH INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2-21-cv-01555-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| SOUTHSTAR CAPITAL LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The following matter is before the court on T-Zone Health Inc.'s ("T-Zone") motion for partial summary judgment, ECF No. 27, and SouthStar Capital LLC's ("SouthStar") motion for summary judgment, ECF No. 28. For the reasons set forth below, the court denies T-Zone's partial motion for summary judgment, ECF No. 27, and grants SouthStar's motion for summary judgment, ECF No. 28.

## I.  BACKGROUND

This case arose out of a series of disputes between T-Zone and SouthStar. T-Zone is a Canadian corporation that imports and sells at wholesale various fitness and health related products. ECF No. 1, Compl. ¶¶ 1, 7. SouthStar is a limited liability company organized under South Carolina law that provides various financial services to commercial businesses, including invoice financing, factoring of accounts receivable, and the collection of receivables. Id. ¶¶ 2, 8. One of SouthStar's customers, 10 Minute Fitness, sells fitness products through large retailers such as Costco and Sam's Club. Id. ¶ 9. SouthStar provides financial services to 10 Minute Fitness including, but not limited to, financing its purchases of fitness equipment from T-Zone. Id. ¶ 10.

1

On November 6, 2019, T-Zone received an order for fitness equipment from 10 Minute Fitness for 2,700 machines at a total price of $947,025.  Id. ¶ 11.  T-Zone prepared invoice number T39237 and sent it to SouthStar via email and SouthStar acknowledged it by email on November 8, 2019.  Id. ¶¶ 12–13; ECF No. 28-7. Consequently, T-Zone ordered the 2,700 machines described in invoice number T39237. Id. ¶ 14.  Thereafter, on March 10, 2020, 10 Minute Fitness sent T-Zone another order for fitness equipment for another 2,700 machines for a total price of $968,625.  Id. ¶ 15.  T-Zone prepared invoice number T39605 which it sent via email to SouthStar and SouthStar acknowledged it by email on March 13, 2020.  Id. ¶¶ 16–17, ECF No. 28-7. Consequently, T-Zone ordered the additional 2,700 machines described in invoice number T39605.  Id. ¶ 18.  T-Zone explains that during the period from June 17, 2019, through June 22, 2020, "SouthStar continued to pay T-Zone for other [T-Zone] equipment purchased by [10 Minute Fitness]."  Id. ¶ 19.  At the hearing, the parties clarified that the orders placed in this action required that a third-party factory in China manufacture the equipment and thereafter ship the equipment to the United States.  ECF No. 47.  The court includes a screenshot of Invoice T39237 to provide context as to the explicit requirements of the orders:

**T-ZONE HEALTH INC.**
59 Comstock Road, Unit 2
Scarborough, Ontario M1L 2G6
CANADA
Tel: (416) 285-6055
Fax: (416) 285-8918
E-Mail:    info@t-zonehealth.com

**INVOICE**

| Invoice No.: | T39237 |
| Date: | 11/06/2019 |
| Page: | 1 |
| Re: Order No | P.O. 5840 |

**Sold to:**
10 Minute Fitness Inc. dba Zaaz
9668 Westheimer Rd #200-95
Houston, TX 77063
1-888-664-9229

**Ship to:**
10 Minute Fitness Inc. dba Zaaz
T-zone Warehouse
10 Minute Fitness to Pick Up

Business No.:    854939170 RT0001

| Item No. | Quantity | Unit | Description | Disc | Unit Price | Amount |
|---|---|---|---|---|---|---|
| 20K | 2,700 | Each | 20K Vibration Machine | | 323.25 | US$872,775.00 |
| ZAAZAerobicMat | 2,700 | Each | ZAAZ Aerobic Mat Kit | | | |
| CHAIR FOLDING-ZAAZ | 2,700 | Each | ZAAZ Folding Chair for vibration machine | | 27.50 | US$74,250.00 |
| | | | Approved for partial shipment Terms: Payment in full due upon arrival at the designated warehouse. All payments made for this PO will apply only to purchase of the goods listed herein, not to any past balance | | | |

ECF No. 28-7, Invoices T39237 & T39605.  Invoice T39605 includes the same language describing the approval of the purchase as well as the terms of payment and delivery.  Id. However, in practice, the manufacturer shipped subsets of the equipment as would fit in the shipping containers.  See ECF No. 28-10.  Nine shipping containers arrived at the warehouse, and payment was processed for each of the nine invoices upon the equipment's delivery.  ECF No. 34-3.

On August 28, 2020, T-Zone received an email (the "Termination Email") from Susan Linney ("Linney"), the COO of SouthStar, stating that SouthStar will not be paying for any further container shipments at this time and explaining that due to COVID-19 SouthStar "has not been paid for a very long time and the Costco relationship has become difficult."  Id. ¶ 20.  As of April 26, 2021, SouthStar had paid for approximately 1,795 machines out of the 5,400 ordered machines.  Id. ¶ 21.  T-Zone alleges it has been damaged in an amount in excess of one million dollars.  Id. ¶¶ 26, 32.

3

On May 26, 2021, T-Zone filed this action against SouthStar alleging breach of contract and promissory estoppel.  ECF No. 1, Compl.  On February 27, 2023, T-Zone filed a partial motion for summary judgment.  ECF No. 27.  SouthStar responded in opposition on March 30, 2023, ECF No. 35, and T-Zone replied on April 13, 2023, ECF No. 39.  On February 28, 2023, SouthStar filed a motion for summary judgment.  ECF No. 28.  On March 30, 2023, T-Zone responded in opposition, ECF No. 34, and SouthStar replied on April 13, 2023, ECF No. 40.  On July 11, 2023, the court held a hearing on the pending motions.  ECF No. 47.  As such, the motions have been fully briefed and are now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a

4

genuine issue for trial." Id. at 249.  In so doing, the court must view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

"The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact." Major v. Greenville Hous. Auth., 2012 WL 3000680, at *1 (D.S.C. Apr. 11, 2012). Nevertheless, "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting Fed. R. Civ. P. 56(e)).  The plain language of Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[C]onclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion." Major, 2012 WL 2000680, at *1.

"Litigants may not thrust upon the Court the burden of combing through the record to make a case on their behalf." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.").  Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Local Civil Rule 7.06 governing responses to motions requires that "[a]ny response supported by discovery material shall specify with particularity the portion of the discovery material relied upon in support of counsel's position, summarize the material in support of counsel's position, and attach relevant portions of the discovery material or deposition." Local Civ. Rule 7.06 (D.S.C.).

## III. DISCUSSION

The court considers the two pending motions for summary judgment together as the parties each seek summary judgment on both causes of action: breach of contract and promissory estoppel. The court evaluates whether either party has clearly shown that there is no genuine dispute of material fact such that it may grant summary judgment by first evaluating the breach of contract cause of action before turning to the promissory estoppel cause of action. See Knibbs v. Momphard, 30 F.4th 200, 213 (4th Cir. 2022) ("A dispute is a 'genuine dispute,' for purposes of precluding summary judgment, if a reasonable jury could return a verdict for the non-moving party.").

### A. Breach of Contract

To establish breach of contract under South Carolina law, a plaintiff must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damages as a direct and proximate result of the breach. See King v. Carolina First Bank, 26 F. Supp. 3d 510, 517 (D.S.C. 2014) (applying South Carolina law). Damages recoverable for a breach of contract must either flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract. Hawkins v. Greenwood Dev.

6

Corp., 493 S.E.2d 875, 880 (S.C. Ct. App. 1997).  Under South Carolina law, to prevail

on a breach of contract claim, the plaintiff bears the burden of establishing the three

elements of a breach of contract claim by a preponderance of the evidence.  See Ferguson

v. Waffle House, Inc., 18 F. Supp. 3d 705, 731 (D.S.C. 2014) (citing Fuller v. E. Fire &

Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).

The parties contest all three elements of a breach of contract cause of action.

First, the parties dispute whether a contract was formed—specifically they deny there

was an offer, acceptance, consideration, and/or a meeting of the minds.  See, e.g., ECF

No. 28-1 at 1, 13–14; ECF No. 35 at 12–18.  Second, the parties dispute whether the

alleged actions constitute breach of contract.  See, e.g., ECF No. 35 at 11–12.  Third, the

parties dispute whether the identified damages of lost profits and T-Zone's obligation to

the manufacturer were proximately caused by the purported breach.  See, e.g., ECF No.

34 at 4–5; ECF No. 40 at 6–7.  Finally, SouthStar raises the affirmative defense of the

statute of frauds.  ECF No. 35 at 16–17; ECF No. 40 at 5, 16–17.  The court considers

each argument in turn.

## 1.  Contract Formation

"The elements required for formation of a contract are an offer, acceptance, and

valuable consideration."  Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 166 (S.C.

2003).  "In order for a contract to arise, there must be a meeting of the minds of the

parties involved with regard to all essential and material terms of the agreement."

Hardaway Concrete Co., Inc. v. Hall Contracting Corp., 647 S.E.2d 488, 492 (S.C. Ct.

App. 2007) (citing Player v. Chandler, 382 S.E.2d 891, 893 (S.C. 1989)).  "Thus, for a

contract to be binding, material terms cannot be left for future agreement."  Stevens &

Wilkinson of S.C., Inc. v. City of Columbia, 762 S.E.2d 696, 701 (S.C. 2014); see also id. at 703 ("[A]s long as the parties know there is an essential term not yet agreed on, there is no contract.").  "In a contract for services two essential terms are the scope of the work to be performed and the amount of compensation." Id. at 701 (quoting W.E. Gilbert & Assocs. v. S.C. Nat'l Bank, 351 S.E.2d 171, 173 (S.C. Ct. App. 1986)).  "Although the existence of a contract is ordinarily a question of fact for the jury, where the undisputed facts do not establish a contract, the question becomes one of law." Id.  "An agreement which leaves open material terms is unenforceable." Id.

In construing a contract, the primary objective of the court is to ascertain and give effect to the intention of the parties.  S. Atl. Fin. Servs., Inc. v. Middleton, 562 S.E.2d 482, 484–85 (S.C. Ct. App. 2002).  A clear and explicit contract must be construed according to the terms the parties have used, with the terms to be understood in their plain, ordinary, and popular sense.  Sphere Drake Ins. Co. v. Litchfield, 438 S.E.2d 275 (S.C. Ct. App. 1993) (citing C.A.N. Enters., Inc. v. S.C. Health & Hum. Servs. Fin. Comm'n, 373 S.E.2d 584 (S.C. 1988)).  However, if the court determines the language of the contract is ambiguous, then "parol evidence is admissible to ascertain the true meaning and intent of the parties." Koontz v. Thomas, 511 S.E.2d 407, 411 (S.C. Ct. App. 1999).  An ambiguous contract is one that can be understood in more ways than just one or is unclear because it expresses its purpose in an indefinite manner. Id.

SouthStar challenges contract formation in its response in opposition to T-Zone's motion for summary judgment and includes it as a basis for its own motion for summary judgment.  See ECF Nos. 28, 35.  SouthStar opposes T-Zone's motion for summary judgment on the basis that no contract was formed because no offer was extended—

8

namely, T-Zone has offered no proof that acknowledgement of invoices meant an agreement to pay for them. ECF No. 35 at 13–14. SouthStar also argues that no valid consideration supported a contract since T-Zone had a preexisting legal duty to supply the equipment. Id. at 12–18. SouthStar emphasizes that, at a minimum, there exist genuine issues of material fact as to whether an offer was extended and to whom. Id. at 17–18. SouthStar reiterates this argument in its motion for summary judgment. ECF No. 28-1

T-Zone contends that it is undisputed that T-Zone offered to order the fitness equipment from its manufacturer if SouthStar would agree to pay for it when it was delivered. ECF No. 27-1 at 4. T-Zone also claims that the emails from Melanie Brown ("Brown"), Senior Account Manager at SouthStar, and Linney show that SouthStar accepted the offer. Id. (citing ECF No. 27-3, Linney Depo.; ECF No. 27-5, Linney Depo.). In particular, the email from Brown to Claire Wu ("Wu") of T-Zone states, "[t]his email serves as acknowledgement and approval from SouthStar for the 12 containers referenced," and includes an attached Invoice No. T39237. ECF No. 27-3 at 9. As for consideration, T-Zone emphasizes that it ordered the equipment from the manufacturer and obligated itself to pay, which serves as consideration. ECF No. 27-1 at 4. Thus, T-Zone argues that a contract was clearly formed.

The court finds that a reasonable jury would find it debatable whether a contract was formed. To begin, the invoices expressly set forth the quantity of equipment ordered—2,700 units on both the first and second orders—and amount due for that equipment—$947,025 on the first order and $968,625 on the second. See ECF Nos. 28-6, 28-7. 10 Minute Fitness's purchase orders provide the specifics of the equipment

ordered and price for the ordered equipment, see ECF No. 28-6, and T-Zone's invoices mirror those units and prices, ECF No. 28-7. T-Zone's invoices included the additional information stating the invoice was "Approved for partial shipment." ECF No. 28-7 at 2. Wu of T-Zone emailed invoice T39237 to Brown and Linney on November 6, 2019, and Brown responded two days later saying, "This email serves as acknowledgement and approval from SouthStar for the 12 containers referenced." ECF No. 28-9. Similarly, on March 13, 2020, Wu again emailed Brown and Linney attaching invoice T39605, and on that same day Linney replied, "This is to confirm that SouthStar will pay for the units as each container is received at the warefhouse [sic]." ECF No. 27-5. Thus, the parties agreed on the number of ordered units and agreed the fixed payment for the ordered units would occur at the time of delivery, with SouthStar providing the financing for 10 Minute Fitness. See Edens v. Laurel Hill, Inc., 247 S.E.2d 434, 436 (S.C. 1978) ("Some terms are considered indispensable to a binding contract. Among these are price, time and place."). Together, these purchase orders, invoices, and contemporaneous emails indicate that a genuine dispute exists as to whether a contract was formed.

## 2. Breach

SouthStar persuasively argues that T-Zone has not demonstrated that a breach occurred since the explicit terms of the emails and the invoices—to the extent they operate as the purported agreement—authorize payment only upon the equipment's arrival to the warehouse. Thus, even if the invoice and acknowledgement serve as a contract, the explicit terms of the contract—specifying payment upon delivery to the warehouse—were not breached because SouthStar paid for all equipment that was delivered to the warehouse. See ECF No. 28-1 at 1, 13; ECF No. 35 at 11–12 (citing

ECF No. 28-4, T-Zone Depo. at 97:17–98:25). SouthStar arrives at this conclusion based on the plain text of the invoices which stated that "payment in full due upon arrival at the designated warehouse" and from a March 13, 2020 email from SouthStar "confirm[ing] that SouthStar will pay for the units as each container is received at the warefhouse [sic]." ECF No. 35 at 11 (citing ECF No. 28-7, Invoices T39237 and T39605; ECF No. 28-10, Shipment Invoices; ECF No. 28-12[1]). SouthStar most succinctly articulates the argument in its reply when it explains that "a breach would have arisen only upon T-Zone's delivery of the goods and SouthStar's failure to pay for the goods delivered. This did not happen." ECF No. 40 at 6.

In reply and in response, T-Zone argues that SouthStar's arguments miss the mark because SouthStar's assertion that no breach occurred "ignores the well-established principal that in a breach of contract action, damages serve to place the non-breaching party in the position he would have enjoyed had the contract been performed." ECF No. 39 at 2 (citing Carolina Winds Owners' Ass'n, Inc. v. Joe Harden Builder, Inc., 374 S.E.2d 897 (S.C. Ct. App. 1988), overruled by Kennedy v. Columbia Lumber & Mfg. Co., Inc., 384 S.E.2d 730 (S.C. 1989)). At the hearing, the court asked T-Zone what constituted the breach in this case and T-Zone pointed to the Termination Email. ECF No. 47. Thus, the court evaluates whether a breach of the purported contract occurred, bearing in mind that T-Zone bears the burden of proof on this element.

---

[1] The court notes that the March 13, 2020 email is not included at ECF No. 28-5. That exhibit includes excerpts from Linney's deposition taken on January 13, 2023. Id. The March 13, 2020 email is available at ECF No. 28-12. For that reason, the court cites the appropriate exhibit, ECF No. 28-12, but notes SouthStar's citation was ECF No. 28-5.

The court finds that T-Zone has not met its burden of proof for breach. A clear and explicit contract must be construed according to the terms the parties have used, with the terms to be understood in their plain, ordinary, and popular sense. See Sphere Drake, 438 S.E.2d at 277. "The court is limited to the interpretation of the contract made by the parties, regardless of its wisdom or folly, apparent unreasonableness, or failure of the parties to guard their rights carefully." Id.

"A condition precedent is an act which must occur before performance by the other party is due." Gecy v. S.C. Bank & Tr., 812 S.E.2d 750, 757 (S.C. Ct. App. 2018) (quoting Alexander's Land Co. v. M & M & K Corp., 703 S.E.2d 207, 214 (S.C. 2010)). "Whether a stipulation in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties to be gathered from the language they employ." Ballenger Corp. v. City of Columbia, 331 S.E.2d 365, 368 (S.C. Ct. App. 1985). "Words and phrases such as 'if,' 'provided that,' 'when,' 'after,' 'as soon as,' and 'subject to' frequently are used to indicate that performance expressly has been made conditional." Id. "Generally, a condition precedent may not be implied when it might have been provided for by the express agreement." Worley v. Yarborough Ford, Inc., 452 S.E.2d 622, 625 (S.C. Ct. App. 1994) (internal quotation marks and citations omitted).

The explicit language on the invoices specifies that the order was "Approved for shipment of containers individually [sic] terms: Payment in full upon arrival at the designated warehouse." ECF No. 28-7 (emphasis added). The emails from Linney confirm this understanding: she replied to Wu's email containing Invoice T39606 saying, "This is to confirm that SouthStar will pay for the units as each container is received at

12

the warehouse [sic]." ECF No. 27-5 (emphasis added). Moreover, the majority of the shipment invoices specified "Payment in full on off loading," with those not indicating as much using language that suggests the equipment was already delivered. See, e.g., ECF No. 28-10. The language used in the contemporaneous purchase invoices, shipment invoices, and in the email from Linney interpreting the invoice clearly indicate that the parties agreed that delivery of the equipment to the warehouse was a condition precedent to the payment for that equipment.

At the hearing, SouthStar emphasized that it is undisputed that SouthStar paid the first eight invoices upon the ordered machines' delivery to the warehouse with 10 Minute Fitness paying for the ninth invoice upon the equipment's delivery to the warehouse. ECF No. 47. At its deposition, T-Zone's Rule 30(b)(6) deponent stated that none of the three remaining containers under Invoice T39237 and none of the goods referenced in Invoice T39605 were ever shipped to the United States or received at the warehouse. ECF No. 28-4, T-Zone Depo. at 106:8–19. Consequently, from the ninth invoice on, no more equipment arrived at the warehouse and SouthStar remitted no more payments. The clear and express terms of the contract set forth that payment would only occur upon the equipment's delivery to the warehouse. It is undisputed that SouthStar paid all the invoices for the equipment that was delivered to the warehouse.[2] Therefore, SouthStar

---

[2] The court notes that there were email communications sent on August 27, 2020, where Wu sent the ninth invoice for approval and payment to Brown and Linney. ECF No. 27-6 at 6–7. Linney thereafter forwarded the email to Ian Cruickshank ("Cruickshank") of 10 Minute Fitness and said, "There is no freaking way I am paying this. I will have Lindsey put them on notice that no more funds will be sent by [SouthStar]. You told me nothing was coming in." Cruickshank replied, "I am planning to pay for it." Id. The result was that T-Zone received payment from 10 Minute Fitness rather than SouthStar and was none the wiser about the internal discord over that shipment. SouthStar then promptly sent the Termination Email to T-Zone the following

did not breach the express terms of the contract. Stated otherwise, the contractual provisions excused SouthStar's lack of performance. See Wingard v. Exxon Co., 819 F. Supp. 497, 504 (D.S.C. 1992) ("There is no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly gave him the right to do.").

Nevertheless, at the hearing, T-Zone claimed that the Termination Email constituted breach. ECF No. 47. In response, SouthStar argued that the Termination Email would, at most, be anticipatory repudiation and, in any event, the email was not unequivocal and therefore could not serve as anticipatory repudiation either.[3] Id.; see also ECF No. 40 at 6. To be clear, T-Zone did not argue that the Termination Email constituted anticipatory repudiation at either the hearing or in any of its briefs,

---

day. See ECF No. 27-6 at 10. Though there was a deviation from the planned payment from SouthStar, the deviation did not result in a breach of contract between SouthStar and T-Zone. Rather, to the extent a breach arose from these communications, it impacted only the contract between 10 Minute Fitness and SouthStar. As such, the court finds that this email exchange between Cruickshank and Linney did not breach the purported contract between SouthStar and T-Zone.

[3] "A repudiation must be a present one . . . [and] must be absolute or unequivocal." Pollitt v. Symphony Ass'n, 1998 WL 1051944, at *3 (S.C. Cir. Ct. Jan. 4, 1998) (internal quotation marks and citations omitted). The Termination Email sent by Linney provides,

> SouthStar will not be paying any further container shipments at this time. Because of Covid, SouthStar has not been paid for a very long time and the Costco relationship has become difficult.
>
> I enjoyed working with all of you and hopefully we can get this back on track in the future.

ECF No. 28-11. SouthStar references the final phrase, "hopefully we can get this back on track in the future," to argue that the anticipatory repudiation was not unequivocal and therefore did not constitute anticipatory repudiation that would give rise to a breach. ECF No. 40 at 6. The court provides this footnote to provide context for SouthStar's larger argument but reiterates that since T-Zone has not claimed anticipatory repudiation as an alternative argument, the court will not now make its argument for it.

notwithstanding SouthStar's counterarguments.  See ECF Nos. 47, 27, 34, 39.  "A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue."  Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up).  T-Zone has not raised the issue of anticipatory repudiation; rather, it has argued that the obligation to pay attached at the time the equipment was ordered, such that the Termination Email constituted breach since the equipment had been ordered prior to that communication.[4]  See ECF No. 39 at 2.  Additionally, though T-Zone now challenges whether there was a meeting of the minds as to when payment was due, its own invoice shows that at the time of formation the parties had the objective intention that payment be made upon the equipment's arrival to the warehouse.  See ECF No. 28-7.  Thus, the court reiterates its conclusion that delivery to the warehouse was a condition precedent to payment for the ordered equipment.

---

[4] In fact, this interpretation puts T-Zone's argument in the best possible light.  In response to SouthStar's claim that the obligation to pay arose at the time of the equipment's delivery, T-Zone erroneously focused on the concept of expectation damages.  See ECF No. 39 at 2.  "SouthStar next argues that it did not breach the contract with T-Zone because it was only obligated to pay for equipment that was delivered by the manufacturer to the warehouse.  However, this 'ignores the well-established principal that in a breach of contract action, damages serve to place the non-breaching party in the position he would have enjoyed had the contract been performed.'"  Id. (quoting Carolina Winds Owners' Ass'n, Inc. v. Joe Harden Builder, Inc., 374 S.E.2d 897 (S.C. Ct. App. 1988), overruled by Kennedy v. Columbia Lumber & Mfg. Co., Inc., 384 S.E.2d 730 (S.C. 1989)).  T-Zone provides no pin cite and the court has been unable to locate that quotation in the Carolina Winds opinion.  Id.  Additionally, the cited authority dealt with negligence and breach of implied warranty, not breach of contract.  Carolina Winds, 374 S.E.2d at 899, 901.  Moreover, Carolina Winds was unambiguously overruled by the South Carolina Supreme Court.  Kennedy, 384 S.E.2d at 734 ("To the degree herein indicated, we express our disapproval and rejection of that opinion.").  As such, the court notes that it has generously construed T-Zone's briefs to argue that the obligation to pay attached earlier than delivery at the warehouse.

15

As such, the court finds that the undisputed facts show: (1) the express terms of the contract state that delivery to the warehouse served as a condition precedent to payment, and (2) SouthStar paid for all equipment that was delivered to the warehouse. Thus, SouthStar's refusal to pay for the undelivered equipment did not constitute a breach. Viewing the evidence in the light most favorable to T-Zone, the court finds that there is no genuine dispute of material fact on the element of breach of contract; therefore, no reasonable juror could find that T-Zone has met its burden of proof for that element. See Anderson, 477 U.S. at 248–49, 255; Celotex Corp., 477 U.S. at 322. Consequently, the court grants summary judgment to SouthStar on the breach of contract cause of action.

The court notes that because T-Zone has not met its burden of proof for the second element of a breach of contract claim—namely, that a breach occurred—the court need not reach any conclusions regarding the parties' arguments regarding the third element of proximate causation of damages or the affirmative defense of the applicability of the statute of frauds. For the reasons stated above, T-Zone's partial motion for summary judgment on the breach of contract claim is denied and SouthStar's motion for summary judgment on the breach of contract claim is granted.

**B. Promissory Estoppel**

Upon granting summary judgment for SouthStar on the breach of contract claim, the court next turns to T-Zone's alternative claim of promissory estoppel. See ECF No. 27-1 at 4. The doctrine of promissory estoppel was first recognized in South Carolina in Higgins Construction Co. v. Southern Bell Telephone & Telegraph Co., 281 S.E.2d 469 (S.C. 1981). The South Carolina Supreme Court explained, "[the] doctrine holds 'an

16

estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice.'" Id. at 470 (quoting 28 Am. Jur. 2d Estoppel and Waiver § 48 (1966)). "A contract and promissory estoppel are two separate and distinct legal theories. They 'are two different creatures of the law; they are not legally synonymous; the birth of one does not spawn the other." Satcher v. Satcher, 570 S.E.2d 535, 538 (S.C. Ct. App. 2002) (quoting Duke Power Co. v. S.C. Pub. Serv. Comm'n, 326 S.E.2d 395, 406 (S.C. 1985)).

"The elements of promissory estoppel are (1) an unambiguous promise by the promisor; (2) reasonable reliance on the promise by the promisee; (3) reliance by the promisee was expected by and foreseeable to the promisor; and (4) injury caused to the promisee by his reasonable reliance." N. Am. Rescue Prod., Inc. v. Richardson, 769 S.E.2d 237, 241 (S.C. 2015) (citing Davis v. Greenwood Sch. Dist. 50, 620 S.E.2d 65, 67 (S.C. 2005)). "The applicability of the doctrine depends on whether the refusal to apply it 'would be virtually to sanction the perpetration of a fraud or would result in other injustice.'" Satcher, 570 S.E.2d at 538 (quoting Citizens Bank v. Gregory's Warehouse, Inc., S.E.2d 316, 318 (S.C. Ct. App. 1988)). "Notably, neither meeting of the minds nor consideration is a necessary element." Barnes v. Johnson, 742 S.E.2d 6, 11 (S.C. Ct. App. 2013). "Thus, in the interest of equity, the doctrine 'looks at a promise, its subsequent effect on the promisee,' and where appropriate 'bars the promisor from making an inconsistent disposition of the property.'" Id. (quoting Satcher, 570 S.E.2d at 538) (emphasis in original). However, "the presence of either an ambiguous promise or

17

an injury not arising out of the inconsistent disposition precludes promissory estoppel's application, though perceived inequities may exist." Id. at 12.  As the South Carolina Court of Appeals recently noted, "[a]dmittedly, determining exactly what [an injury in reliance on an unambiguous promise] means in a particular case can be difficult, and every promise cannot be enforced based solely on the promisee's hope the promisor will follow through." Cruz v. City of Columbia, 877 S.E.2d 479, 483 (S.C. Ct. App. 2022).

T-Zone brings a cause of action for promissory estoppel in the alternative and alleges that SouthStar's acknowledgments of its invoices were unambiguous and documented by emails.  Compl. ¶ 29.  Furthermore, T-Zone argues it reasonably relied on the acknowledgements to order the equipment requested by 10 Minute Fitness and such reliance was reasonable, expected, and foreseeable because it was based on their prior course of dealing.  Id. ¶ 30–31.  SouthStar argues that T-Zone has not met its burden on any of the four elements for promissory estoppel.  See, e.g., ECF No. 28-1 at 2.  Further, SouthStar raises the affirmative defense that since a contractual remedy is available to T-Zone against 10 Minute Fitness, promissory estoppel is unavailable as a cause of action. See, e.g., ECF No. 35 at 19–20.  The court evaluates each of the elements of promissory estoppel before turning to SouthStar's affirmative defense.

### 1.  Unambiguous Promise

Promissory estoppel requires, by clear and convincing evidence, a "promise unambiguous in its terms." Cruz, 877 S.E.2d at 485 (citing Satcher, 570 S.E.2d at 538–40).  "This necessity for unambiguous terms, in the absence of a contract, reflects balancing the availability of an equitable remedy with ensuring the remedy's appropriate application." Id.  Ambiguous terms include the absence of "any terms, conditions,

timelines, or performance requirements." See A&P Enters., LLC v. SP Grocery of Lynchburg, LLC, 812 S.E.2d 759, 764 (S.C. Ct. App. 2018).

In its motion for summary judgment, T-Zone argues that there is an unambiguous promise because SouthStar agreed to pay for the equipment described in the invoices in their email responses to T-Zone. ECF No. 27-1 at 5. In its response in opposition, SouthStar argues that the promise was not articulated, nor did it have definite terms, and therefore it was ambiguous. ECF No. 35 at 20–22. At most, the communications say, "Please see invoice attached," which SouthStar argues lacks definite terms. Id. at 22. In its reply, T-Zone argues that the promise was not ambiguous because it was in writing from Linney.[5] ECF No. 39 at 6–7 (citing ECF No. 27-3).

To reiterate, the parties agreed as to the number of ordered units and that the fixed payment for the ordered units would occur at the time of delivery, with SouthStar providing the financing for 10 Minute Fitness. For the same reasons already provided in the court's evaluation of contract formation, supra III.A.I, the court finds that a reasonable jury could determine the email exchanges between T-Zone and SouthStar created a promise sufficient for a promissory estoppel claim.

---

[5] T-Zone argues that Linney responded via email that SouthStar "needs to confirm the invoice for 12 new containers that was sent on Weds 11/06 with T-Zone. Payment for the containers will be due upon arrival spanning between the middle of January and the middle of March, in the same way as the 10 containers that were confirmed to T-Zone by [SouthStar] on 6/26 have been paid as they've arrived." ECF No. 39 at 6–7 (citing ECF No. 27-3). However, that construction is not entirely accurate. The quoted language comes from an email from Cruickshank of 10 Minute Fitness to Linney where he requests that SouthStar confirm the invoices in question, to which Linney replied, "[Brown] please email [Wu] and confirm." ECF No. 27-3 at 6.

19

### 2. Reasonable Reliance by T-Zone

"A determining factor in deciding whether to enforce a promise under the theory of promissory estoppel is the reasonableness of the promisee's reliance." White v. Roche Biomedical Lab'ys, Inc., 807 F. Supp. 1212, 1219 (D.S.C. 1992), aff'd, 998 F.2d 1011 (4th Cir. 1993) (quoting Storms v. Goodyear Tire & Rubber Co., 775 F. Supp. 862, 868 (D.S.C. 1991)). If the promise is ambiguous, it impacts the second factor and renders the promise's reliability questionable. See Cruz, 877 S.E.2d at 486; A&P Enters., 812 S.E.2d at 764 ("[R]eliance on any alleged promise by [the promisor] was unreasonable in light [of] the ambiguities of the alleged promise.").

SouthStar principally argues in both its response in opposition and motion for summary judgment that T-Zone has not and cannot show that its reliance on the purported promise was reasonable. See ECF No. 35 at 18, 22–24; ECF No. 28-1 at 15–17. In its response in opposition, SouthStar emphasizes that reliance on the purported promise was conspicuously unreasonable in light of T-Zone's own contemporaneous records—namely, T-Zone was forcefully attempting to collect payment on six outstanding invoices that it argues SouthStar owed, which resulted in the filing of Case No. 2:20-cv-02519-DCN (the "First Action"). ECF No. 35 at 18, 22–24. In reply, T-Zone argues that its reliance was reasonable because the course of dealing shows that SouthStar paid for the first seven shipments of the order.[6] ECF No. 39 at 7–8. To make this argument T-Zone cites Satcher v. Satcher, 570 S.E.2d 535 (S.C. Ct. App. 2002), to

---

[6] The court notes that the parties have both since agreed that T-Zone received payment for the nine containers that had arrived to the warehouse, with SouthStar paying for the first eight. As such, the "seven shipments" referenced here is likely stated in error.

show that it was reasonable for the promissee to rely on the promisor's representation where the promisee took action by spending money or incurring liability based on the promise. Id.

In its motion for summary judgment SouthStar again emphasizes the unreasonableness of T-Zone's reliance on SouthStar's purported promise. See ECF No. 28-1 at 18. Namely, "[a]t the time T-Zone issued Invoice T39237, it was forcefully attempting to collect payment on six outstanding invoices totaling $167,125.00 that it argued SouthStar owed it." Id. at 16. Notably, less than four hours prior to issuance of Invoice T39237, T-Zone told SouthStar that "it had failed to fulfill prior promises and that its commitments had no value or credibility." Id. at 16–17. At the deposition, T-Zone's representative testified that on the same date it issued Invoice T39237, T-Zone was "concerned that [SouthStar's] assurances [were] not what we would expect from a financial institution." Id. at 17 (citing ECF No. 28-4, T-Zone Depo. at 148:19–25). In response, T-Zone notes that it is "somewhat remarkable" that SouthStar is using its own failure to pay invoices "to argue that it cannot be trusted when making a promise." ECF No. 34 at 5. Again, T-Zone argues that it was not unreasonable to rely on SouthStar to pay when it "honored its obligation under the agreement from November of 2019 until August of 2020, when it notified T-Zone that it would not pay for any more shipments." Id. at 6. In reply, SouthStar reemphasizes T-Zone's language in its email saying that SouthStar's "commitments . . . seem[ingly] do[] not have value" and that SouthStar had lost all credibility. ECF No. 40 at 8 (quoting ECF No. 28-8). SouthStar then pivots to argue that T-Zone's delayed response to the cancelled orders—emailing the Manufacturer one year and four months after SouthStar's email—indicates that T-Zone delayed

21

because it "was acting pursuant to or in reliance on its relationship with 10 Minute Fitness, not SouthStar." Id. at 11.

The court finds there are genuine issues of material fact that preclude the court definitively finding T-Zone's purported reliance on SouthStar's alleged promise to be reasonable. In favor of finding T-Zone's reliance reasonable, evidence shows that SouthStar paid for each shipment that had arrived to the warehouse. See, e.g., 28-10; 34-3. Weighing against such a conclusion, evidence also shows that at the time the purported promise was made, SouthStar had refused to pay for six previously issued invoices at issue in the First Action which remains a point of contention between the parties. See, e.g., ECF No. 28-4, T-Zone Depo. at 148:19–150:13; ECF No. 28-2. In fact, on the same date Invoice T39237 was issued, T-Zone sent an email to SouthStar saying "it had failed to fulfill prior promises and that its commitment had no value or credibility." ECF No. 28-1 at 16–17 (referencing ECF No. 28-8 at 2, the "Credibility Email"). Based on the conflicting evidence, this is an issue best reserved for the eventual factfinder at trial.

### 3. T-Zone's Reliance was Expected and Foreseeable to SouthStar

There is no clear caselaw defining what is expected or foreseeable reliance, but judges tend to either use a "know it when they see it" commonsense benchmark or leave it for the jury to decide. See, e.g., Cruz, 877 S.E.2d 479; Craft v. S.C. Comm'n for Blind, 685 S.E.2d 625, 628–29 (S.C. Ct. App. 2009). Reliance, in a general sense, is evidenced by "dependence or trust by a person, esp[ecially] when combined with action based on that dependence or trust." Black's Law Dictionary (10th ed. 2014).

22

In its motion for summary judgment, T-Zone argues that "[b]ased on the email exchanges and the course of dealing between the parties, it was expected and foreseeable that T-Zone would rely on the approvals from SouthStar."  ECF No. 27-1 at 5.  In its motion for summary judgment, SouthStar argues that because of T-Zone's email to SouthStar where it said SouthStar "had failed to fulfill prior promises and that its commitments had no value or credibility," it is also self-evident that SouthStar would not expect or foresee that T-Zone would act on its purported promise.  See ECF No. 28-1 at 17 n.2 (citing White, 807 F. Supp. at 1217).  In response to SouthStar's motion, T-Zone argues that it is undisputed that SouthStar "paid for the first seven shipments . . . exactly as it promised that it would."  ECF No. 34 at 5.  Thus, T-Zone's continued reliance would be expected or foreseeable.  Id.  As best the court can tell, the parties did not provide arguments for or against whether the reliance was expected and foreseeable beyond what is stated above.

The court first examines SouthStar's argument, previously raised under the reasonable reliance prong, that the Credibility Email sent on the same date that Invoice T39237 was issued would result in in SouthStar "not expect[ing] or foresee[ing] that T-Zone would rely on its purported promise."  ECF No. 28-1 at 17 n.2 (referencing ECF No. 28-8).  To reiterate, Wu sent the Credibility Email on November 6, 2019 at 9:50 a.m. to Brown, Linney, Cuickshank, and Aboody in reference to the six disputed invoices in the First Action.  ECF No. 28-8.  She wrote that there was "LOSS OF CREDIT FACILITY and CREDIBILITY OF [SOUTHSTAR]," and thereafter noted that "[SouthStar] commitments which seems [sic] does [sic] not have value."  Id. at 2.  Later that day at 1:09 p.m., Wu sent another email to the same group of people with Invoice

T39237 attached for acknowledgement and approval.  ECF No. 28-9.  Together, these emails tend to show conflict in the relationship between T-Zone, SouthStar, and 10 Minute Fitness.  But the court does not find the emails dispositive for either party—they tend to suggest that SouthStar would not expect T-Zone to have the entire order of 2,700 machines delivered immediately, but they also tend to show that despite the disputed invoices, T-Zone still relied on 10 Minute Fitness and SouthStar for payment of the orders.

The court next examines T-Zone's argument that SouthStar was aware that T-Zone had acted in reliance on the purported promise.  T-Zone cites to Satcher v. Satcher which says "[a] promisor's failure to take any action when he was aware of the actions taken by the promise reinforce the determination that the reliance was reasonable."  ECF No. 34 at 6 (citing Satcher, 570 S.E.2d at 537; Furman Univ., 117 S.E. at 362).  T-Zone therefore argues that SouthStar knew it had already ordered the equipment from the manufacturer.  Id.  In Satcher, the court found that a grandson's reasonable reliance on his grandfather's express promise resulted in the expected and foreseeable consequence of moving to his grandfather's house and living there for twenty years to provide his grandfather care and companionship.  570 S.E.2d at 539–40.  However, there is no evidence before the court that clearly establishes that SouthStar knew or believed that T-Zone sought delivery of all the machines 10 Minute Fitness had ordered with its manufacturer.  If SouthStar believed as much, such a belief would be mistaken because T-Zone explained in its deposition that its manufacturer employed just-in-time manufacturing whereby the manufacturer segmented each order into numerous containers when it received the order from T-Zone.  See ECF No. 28-4, T-Zone Depo. at 159:1–15;

ECF No. 40-1 (referencing in an email to its manufacturer that 10 Minute Fitness placed an order for fifteen more containers). This accords with the multiple deliveries and invoices for each shipment, where it would be reasonable for SouthStar to believe each shipment constituted a separate order T-Zone placed with the manufacturer. See ECF No. 28-10. T-Zone's conclusory statement that "SouthStar knew that T-Zone was relying on its promise because T-Zone ordered the equipment from the factory," is not dispositive because there is no evidence that SouthStar believed all the equipment had been ordered, versus just a subset. See ECF No. 34 at 6; ECF No. 28-4, T-Zone Depo. at 164:7–9 (confirming that T-Zone never placed an order with the manufacturer for the last three containers of Invoice T39237). Again T-Zone has not presented any evidence that SouthStar was aware of any specific actions taken by T-Zone in reliance on the purported promise—and, to the extent the court infers that SouthStar were aware, it mitigated accordingly by sending the Termination Email.

Nor is there evidence that shows T-Zone's eventual settlement with its manufacturer for its damages was an expected or foreseeable consequence of the purported promise. SouthStar had a twenty-one-page factoring agreement with 10 Minute Fitness which does not address the settlement of the manufacturer's damages. ECF No. 35-8. The factoring agreement does address default, remedies, and bankruptcy, but does not establish or imply that SouthStar would become liable in 10 Minute Fitness's stead for its manufacturer's damages. ECF No. 35-8 at 6–7, 11. Thus, to the extent a promise existed between T-Zone and SouthStar, T-Zone has presented no evidence that suggests the parties contemplated SouthStar absorbing the manufacturer's damages; rather, the parties liable for said damages would presumably be the parties that

25

ordered the equipment: 10 Minute Fitness and T-Zone.  In fact, T-Zone clarified that SouthStar was not a party to the settlement negotiations with the manufacturer nor did SouthStar help negotiate the settlement amount.  ECF No. 34-1 at 198:7–19.  Rather, T-Zone reached a settlement amount, which came to twenty percent of the of the wholesale price for the fifteen cancelled containers, but did so well after the Termination Email and without involving SouthStar or 10 Minute Fitness.  ECF No. 34-2 at 4.  There is no evidence before the court that shows that T-Zone sought to involve either party in the settlements, nor is there express language in the purported promise which indicates that the manufacturer's damages were expected or foreseeable consequences of the purported promise between T-Zone and SouthStar.

Consequently, the court finds that a reasonable jury could not find that T-Zone's manufacturer's damages were an expected or foreseeable consequence of the purported promise between it and SouthStar.  This alone warrants granting summary judgment on the promissory estoppel claim for SouthStar, but additional consideration of both causation and the affirmative defense of a contractual remedy bolster that conclusion.

### 4.  Injury Caused by T-Zone's Reasonable Reliance

The court has not found a clear rule regarding the fourth element of promissory estoppel under South Carolina law because courts tend to evaluate causal injury on a case-by-case basis and by analogy to other courts' decisions, but at minimum, "[t]he proof of an injury in reliance in promissory estoppel appears to be something at least slightly different than a prejudicial change in position."  See Cruz, 877 S.E.2d at 483 (summarizing South Carolina promissory estoppel cases to evaluate the fourth element of a promissory estoppel claim).  One court explained that "[i]n order to demonstrate that

26

the injury was sustained in reliance upon an alleged promise, the promisee must show, but for the promisor's inconsistent disposition, the complained-of injury would not have otherwise resulted." Barnes, 742 S.E.2d at 14. "Damages recoverable under a claim of detrimental reliance are carefully circumscribed; the plaintiff may recover only those expenditures made in reliance upon defendant's promise." Blanton Enters., Inc. v. Burger King Corp., 680 F. Supp. 753, 776 (D.S.C. 1988) (quoting RCM Supply Co., Inc. v. Hunter Douglas, Inc., 686 F.2d 1074, 1079 (4th Cir. 1982) (applying Maryland common law)).

　　　　In its motion for summary judgment, T-Zone's arguments on this prong specify that it "has been injured to the extent of its obligations to the manufacturer." ECF No. 27-1 at 5. It explains that "[a]s a result of the cancellation of the orders for the equipment . . . T-Zone has agreed to pay the manufacturer $126,022.50 for the manufacturer's lost profits." Id. (citing ECF No. 27-7, T-Zone Depo. at 198:2–19). In its response in opposition, SouthStar argues that T-Zone's manufacturer damages of $126,022.50 are consequential damages that cannot be recovered. ECF No. 35 at 25–28. SouthStar argues that if there were a contract, it did not breach it, and even if there were a contract and a breach, T-Zone did not take ordinary efforts to minimize consequential damages which impacts any analysis of causation and damages. Id. Additionally, SouthStar argues that T-Zone's manufacturer's lost profits were not within the parties' contemplation at the time the purported contract was formed. Id. Finally, SouthStar argues that the manufacturer's damages are due to COVID-19 and not any action by SouthStar. Id. SouthStar's reply most clearly states its argument: "the [Termination] Email was not the proximate cause of T-Zone's Manufacturer Liability, and T-Zone did

not act reasonably to mitigate its damages." ECF No. 40 at 1–2. SouthStar highlights

that T-Zone's representative testified that there were no orders in production at the time

of SouthStar's Termination Email. Id. at 10 (citing ECF No. 40-3, T-Zone Depo. at

157:9–160:16). Moreover, SouthStar stresses that T-Zone has repeatedly testified that it

did not cancel any orders with the Manufacturer. Id. at 9–10 (citing ECF No. 40-3, T-

Zone Depo. at 162:7–16; ECF No. 35-4, Aboody Depo. at 33:6–22; ECF No. 35-5, T-

Zone Answer to Interrogatory 19). Thus, "[c]ancelling the orders nearly a year and a half

after SouthStar's [Termination] Email was not reasonably prudent mitigation and, further,

demonstrates that the [Termination] Email was not the proximate cause of T-Zone's

Manufacturer Liability." Id. at 3. For these reasons, SouthStar argues that it is not

responsible for T-Zone's Manufacturer Liability.[7] Id. at 8.

The court agrees for two reasons: (1) T-Zone waited an extraordinarily long time

to cancel the order with the manufacturer, and (2) T-Zone unilaterally sought a settlement

with the manufacturer that it now seeks to have SouthStar indemnify. Together those

facts undermine T-Zone's argument that the injury was caused by its expected and

foreseeably-reasonable reliance on the purported promise T-Zone had with SouthStar.

First, T-Zone waited an unjustifiably long time to cancel the contracts.[8] In its

deposition T-Zone explained that it and the manufacturer used just-in-time ordering and

---

[7] SouthStar also argues that either T-Zone did not mitigate its damages by
cancelling the orders, or, if it did cancel the order, it did not do so in a manner to avoid
further expenditure which runs afoul of the doctrine of avoidable consequences. ECF
No. 40 at 8 (referencing Phillips & Jordan, Inc. v. McCarthy Improvement Co., 2020 WL
5793377, at *32 (D.S.C. Sept. 29, 2022), amended (D.S.C. Feb. 1, 2021)).

[8] The court notes that "[t]he reasonableness of actions to mitigate damages is
ordinarily a question for the jury." McClary v. Massey Ferguson, Inc., 354 S.E.2d 405,
408 (S.C. Ct. App. 1987) (citing Bannon v. Knauss, 320 S.E.2d 470 (S.C. Ct. App.
1984)) (considering failure to mitigate damages in a breach of contract action).

manufacturing whereby there was no ongoing production, but rather a rolling production. ECF No. 28-4, T-Zone Depo. at 159:1–15.  T-Zone received the Termination Email on August 28, 2020, but did not cancel its order with the manufacturer until January 6, 2022.[9]  ECF Nos. 28-10, 35-9 at 2, 40-1, 40-3.  In fact, T-Zone specifies that it does not know if it contacted the manufacturer right away after receiving the Termination Email but thinks it did not and instead "waited to see what was going to happen."  ECF No. 40-2, T-Zone Depo. at 158:5–23.  "[T]he sustained injury must result from an inconsistent disposition by the promisor."  Barnes, 742 S.E.2d at 11; Craft, 685 S.E.2d at 629 (holding an injury that would have occurred independent of any inconsistent disposition is beyond promissory estoppel's reach).  The court finds this to be an unjustifiably long delay in part because of the known manufacturing timeline.[10]  That is relevant because mitigation of damages requires T-Zone's reasonably prompt notification of the cancelled order so

---

Consequently, the court explains that the almost one-and-a-half-year delay to cancel the orders after receipt of the Termination Email is not itself dispositive on the issue of causation, but should be considered in concert with the other evidence before the court.

[9] T-Zone sent an email to the manufacturer on May 19, 2020, stating that SouthStar and 10 Minute Fitness "committed themselves for 15 more containers."  ECF No. 40-1 at 3.  Aboody went on to say that "All I know is that they have to buy 15 containers either voluntarily or through the courts which may take two years or more." Id.  Though he explained the situation with the contested financials, T-Zone did not cancel the contract and instead appeared to emphasize that the fifteen containers were still needed.  Id.  However, this interpretation is contradicted in part by T-Zone's deposition where it explained there was no cancellation because T-Zone would have waited to order the tenth container until the ninth container was received, paid for, and 10 Minute Fitness had orders on deck.  ECF No 40-2, T-Zone Depo. at 160:10–16.  Thus, nothing needed to be cancelled since no order was placed.  See id.  Overall, these contradicting communications appear to show that T-Zone and the manufacturer both understood the order was not cancelled, but merely delayed, until T-Zone informed the manufacturer of the official cancellation in January 2022.  See ECF No. 40-3.

[10] In its deposition, T-Zone explained that typically upon placing an order it would take the manufacturer thirty to forty days to manufacture it, depending on what components the manufacturer had in stock, plus a few weeks of production and shipment to the port.  ECF No. 28-4, T-Zone Depo. at 30:3–31:25.

that the manufacturer could cancel its own orders of components and reallocate any previously purchased components to other orders as may be possible.[11]  See ECF No. 28-4, T-Zone Depo. at 164:7–25.  The court further observes that such a long delay leaves ample room for intervening causes to break the link between the inconsistent actions of the promisor and any damages suffered.

Second, despite now claiming that SouthStar must indemnify T-Zone for the manufacturer's damages, T-Zone conceded that SouthStar was not a party to the settlement negotiations with the manufacturer nor did SouthStar negotiate the settlement amount.  ECF No. 34-1 at 198:7–19; ECF No. 28-2 at 5–7.  In fact, T-Zone unilaterally reached a settlement amount which came to twenty percent of the wholesale price for the fifteen cancelled containers without involving SouthStar or 10 Minute Fitness.  ECF No. 34-2 at 4; see also Craft, 685 S.E.2d at 627–29 (refusing to apply promissory estoppel to remedy an injury occurring after a blind vendor's reliance upon an unambiguous promise because the complained of harm resulted independently from the promisor's inconsistent disposition).  Or as SouthStar puts it, T-Zone "voluntarily committed to pay a settlement without demonstrating an underlying commitment [by SouthStar]."  ECF No. 35 at 8.  It would be anomalous to find that SouthStar—the financing company for 10 Minute Fitness—was liable for a settlement amount that T-Zone unilaterally reached with its manufacturer when SouthStar was not included in the settlement discussions and when 10

---

[11] The court notes that the full transcript of this exchange is not included in the motions for summary judgment as an attachment and therefore it is unclear whether the components in question can be reused by the manufacturer or by T-Zone.  See ECF No. 28-4, T-Zone Depo. at 164:7–25.  In any event, it shows that T-Zone had subjective knowledge that the cancelled orders would require it or the manufacturer to pivot to other projects, which reinforces the importance of prompt notice to the manufacturer to mitigate damages.

Minute Fitness—the entity that placed the order—was not named as a defendant in the action.  See ECF No. 28-3, Aboody Depo. at 43:17–44:6 (explaining that T-Zone has not sought payment from Cruickshank because he went bankrupt).

As such, the court finds that T-Zone has not presented any evidence such that a reasonable jury could find in its favor on the fourth element of promissory estoppel. Simply put, there is insufficient evidence before the court that T-Zone's injury occurred in reasonable reliance on SouthStar's purported promise: rather, the evidence tends to show that the manufacturer's damages occurred because 10 Minute Fitness—the entity that placed the order—went bankrupt, and T-Zone failed to timely mitigate.  In any event, the court concludes that though there is no genuine dispute of material fact on either the third or fourth element of a promissory estoppel claim such that a reasonable jury could find T-Zone has met its burden, the promissory estoppel claim is also precluded by the existence of a valid contract between 10 Minute Fitness and T-Zone governing the equipment and damages in question.

### 5.  Contractual Remedy

"In South Carolina, a party is generally precluded from pursuing a claim for either unjust enrichment or promissory estoppel where a valid contract governs the subject matter in dispute."  Besley v. FCA US, LLC, 2016 WL 109887, at *3 (D.S.C. Jan. 8, 2016).  Certainly, when promissory estoppel and/or unjust enrichment claims are stated in the alternative to a breach of contract claim where the existence of a contract is contested, courts have found it premature to dismiss those causes of action where the contractual remedy is uncertain.  See id.; Melton v. Carolina Power & Light, 2012 WL 2401635, at *3 (D.S.C. June 25, 2012).

SouthStar argues that T-Zone cannot bring a promissory estoppel action against SouthStar when it has a contractual remedy for the same injury against 10 Minute Fitness.  In its response in opposition, SouthStar explains that because T-Zone had a contractual relationship with 10 Minute Fitness, it cannot recover from SouthStar on a promissory estoppel theory for 10 Minute Fitness's failure to pay for the goods it received.  ECF No. 35 at 19–20.  Put differently, SouthStar argues that "T-Zone has simply decided not to pursue its contractual remedy against 10 Minute Fitness and cannot use an equitable claim against SouthStar to usurp that right."  Id. at 20.  In response, T-Zone argues that SouthStar is incorrectly applying that standard because courts typically apply that standard "when a party is seeking injunctive relief, not under promissory estoppel."  ECF No. 39 at 5.  T-Zone also argues that the contractual remedy against 10 Minute Fitness would not be adequate.

It is curious that T-Zone omitted 10 Minute Fitness as a defendant in this lawsuit. The evidence before the court shows that T-Zone and 10 Minute Fitness had a longstanding relationship that predates SouthStar's involvement by almost twelve years. See ECF No. 28-4, T-Zone Depo. at 11:3–15 (explaining in January 2023 that T-Zone's relationship with 10 Minute Fitness started fifteen years prior to the deposition); ECF No. 35-8 at 21 (showing execution of the Guaranty on May 18, 2019).  Moreover, the purchase orders, manufacturer's packing lists, and the shipment and payment invoices are explicitly between 10 Minute Fitness and T-Zone, with no mention of SouthStar.  See, e.g., ECF Nos. 28-6, 28-7, 28-10, 35-8; see also ECF No. 35-4, Linney Depo. at 26:9–23 (explaining that supplier invoices do not typically show SouthStar as the obligated party and that SouthStar has no obligation to pay until it "decide[s] to do the PO funding for

32

the client"); ECF No. 35-6, Brown Depo. at 30:6–13 (explaining that SouthStar's decision not to pay an invoice "would have been based on the credit availability for the funds available for 10 Minute Fitness").  Thus, Invoices T39237 and T39605 established that there was a contract between 10 Minute Fitness and T-Zone.  ECF No. 28-7. SouthStar provided financing to 10 Minute Fitness to facilitate the order, but the order was placed by 10 Minute Fitness.  Id.  Thus, the appropriate party in default is 10 Minute Fitness, not SouthStar.

"'Promissory estoppel comes into play in situations where actual consideration is not present,' and is thus 'inapplicable in situations where a contract exists since a necessary element of a valid contract is consideration.'"  White, 807 F. Supp. at 1217 (quoting Glover v. Lockheed Corp., 772 F. Supp. 898, 907 (D.S.C. 1991)).  "If a valid, enforceable contract exists between the parties as to a certain issue, their rights and obligations are governed solely by the contract terms."  Lynch v. Sease, 244 F. App'x 736, 739 (6th Cir. 2007) (applying South Carolina law).  Based on the evidence before the court, the inevitable conclusion is that the party that ordered the equipment in dispute, 10 Minute Fitness, is not a party to this lawsuit because of its insolvency.  ECF No. 28-3, Aboody Depo. at 43:17–44:6 (explaining that T-Zone has not sought payment from Cruickshank because "[h]e doesn't have a pot to pee in"); ECF No 28-4, T-Zone Depo. at 17:6–18:5 (explaining that "[Cruickshank] has always had a little trouble paying," and that he presently owes T-Zone an amount "[i]n the millions.").  10 Minute Fitness's inability to pay does not authorize T-Zone to recover in equity against SouthStar merely because SouthStar is more financially stable when a contractual remedy exists against 10 Minute Fitness.  Stated otherwise, "[i]n this case there is no need for the equitable

doctrine of promissory estoppel because [T-Zone] ha[s] other remedies that make [it] whole." See Lynch, 244 F. App'x at 739.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** T-Zone's motion for summary judgment, and **GRANTS** SouthStar's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 9, 2023**
**Charleston, South Carolina**